IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Southern Division)

SHANE FELDMAN, *et al.*,

    Plaintiffs,

    v.                          Case No. AW-06-2266

PRO FOOTBALL, INC., *et al.*

    Defendants.

    \*    \*    \*    \*    ooo0ooo    \*    \*    \*    \*

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Joseph B. Espo, Federal Bar No. 07490
jbe@browngold.com
Brown, Goldstein & Levy, LLP
120 East Baltimore Street, Suite 1700
Baltimore, Maryland 21202
Phone: (410) 962-1030

Marc P. Charmatz, Federal Bar No. 09358
marc.charmatz@nad.org
and
Rosaline Crawford, Federal Bar No. 15643
rosaline.crawford@nad.org
National Association of the Deaf
Law and Advocacy Center
8630 Fenton Street, Suite 820
Silver Spring, Maryland 20910
(301) 587-7732 (V/TTY)

Rebecca B. Baden
Student Attorney
Rebecca.baden@clinic.law.umaryland.edu
University of Maryland School of Law
500 W. Baltimore Street
Baltimore, Maryland 21201

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................... iii

BACKGROUND ................................................................................................. 1

UNDISPUTED FACTS ........................................................................................ 2

    I.      PARTIES ........................................................................................ 2

           A.     Plaintiffs ................................................................................ 2

                 i.    Shane Feldman ................................................... 2

                 ii.   Paul Singleton ................................................... 4

                 iii.  Brian Kelly .......................................................... 4

           B.     Defendants ........................................................................... 4

    II.     DEFENDANTS' HISTORY OF VIOLATING TITLE III OF
           THE ADA AND EFFORTS TO OBTAIN COMPLIANCE. ..................... 5

STANDARD OF REVIEW ON SUMMARY JUDGMENT ............................................ 11

ARGUMENT ....................................................................................................... 12

    I.      PLAINTIFFS ARE ENTITLED TO DECLARATORY AND
           INJUNCTIVE RELIEF FOR DEFENDANTS' VIOLATIONS
           OF THE ADA. ........................................................................... 12

           A.     Plaintiffs Are Entitled to Declaratory Relief Because
                 Defendants Have Refused to Admit That Title III of the
                 ADA Mandates That FedExField Be Accessible to
                 Individuals Who Are Deaf or Hard of Hearing. ............................ 12

           B.     Plaintiffs Are Entitled To Declaratory and Injunctive
                 Relief Because Defendants Have Not Made FedExField
                 Fully Accessible To Deaf and Hard of Hearing Patrons. ............ 16

                 i.    Line of Sight Violations ........................................ 17

                 ii.   Entertainment Accompanying the Football Game ............... 18

Page

        iii.   Defendants Must Caption the Radio in the
            Concourse Areas.........................................................................19

II.    DEFENDANTS ARE NOT ENTITLED TO SUMMARY
      JUDGMENT EITHER BASED ON AN ALLEGED
      LACK OF STANDING OR ON THE GROUNDS THAT
      PLAINTIFFS' CLAIMS ARE MOOT. ...................................................21

      A.    Defendants Filed Their Motion to Dismiss Under the
            Wrong Rule of Civil Procedure. ...................................................21

      B.    Plaintiffs Have Standing Because They Were Suffering
            Redressable Injuries In Fact Due to Defendants'
            Discriminatory Conduct at the Time They Filed Their
            Complaint. .................................................................................22

            i.     Defendants Impermissibly Conflate the Standard
                  Governing Mootness With The Standard Governing
                  Standing. .............................................................................23

            ii.    Plaintiffs Have Suffered An Injury In Fact Due
                  to Defendants' Discriminatory and Illegal Conduct
                  in Denying Plaintiffs the Opportunity to Enjoy
                  FedExField's Services, Facilities, Privileges,
                  Advantages, and Accommodations. ....................................24

            iii.   Plaintiffs Continue to Suffer Harm as a Result of
                  Defendants' Discriminatory Conduct. .................................29

            iv    Plaintiffs Filed Claims Capable of Redress By This

                  Court and Therefore They Have Standing. ..........................30

      C.    PLAINTIFFS' CLAIMS ARE NOT MOOT BECAUSE
            DEFENDANTS HAVE NOT MET THE FORMIDABLE
             BURDEN OF DEMONSTRATING THAT THEY WILL
            NOT CONTINUE THEIR DISCRIMINATORY
            PRACTICES. . ...........................................................................31

THIS COURT SHOULD GRANT INJUNCTIVE AND DECLARATORY
RELIEF...................................................................................................................37

CONCLUSION ...................................................................................................37

## TABLE OF AUTHORITIES

Cases                                                                                    Page(s)

*Access 4 All, Inc. v. Cases Marina Owner, LLC.,*
    458 F. Supp. 2d 1359 (S.D. Fla. 2006),
    *vacated,* 2008 WL 311037 (11th Cir. 2008)................................................................35-36

*Advanced Mgmt. Tech., Inc. v. F.A.A.,*
    211 F.3d 633 (D.C. Cir. 2000) ......................................................................................26

*Anderson v. Liberty Lobby, Inc.,*
    477 U.S. 242 (1986) ......................................................................................................11

*Baltimore Neighborhoods, Inc. v. LOB, Inc.,*
    92 F.Supp.2d 456 (D. Md. 2000)..................................................................................36

*Banchieri v. City of New York,*
    No. 01 CV 1853(HB), 2001 WL 1018351  (S.D.N.Y. Aug. 31, 2001) .........................27

*Becker v. Fed. Election Com'n,*
    230 F.3d 381 (1st Cir. 2000) ........................................................................................23

*Bethlehem Steel Corp. v. Kreps,*
    1980 WL 140 (D. Md. May 8, 1980)........................................................................23-24

*Brother v. CPL Investments, Inc.,*
    317 F. Supp. 2d 1358 (S.D. Fla. 2004) .......................................................................36

*Celotex Corp. v. Catrett,*
    477 U.S. 317 (1986) ................................................................................................11, 21

*Concentrated Phosphate Export Ass'n,*
    393 U.S. 199 (1968) ................................................................................................22, 32

*Cornilles v. Regal Cinemas, Inc.,*
    No. Civ. 00-173-AS, 2002 WL 31440885 (D. Or. Jan 3, 2002),
    *report adopted in part,* No. Civ. 00-173-AS, 2002 WL 31469787 ..................................17

*Doran v. 7-Eleven, Inc.,*
    506 F.3d 1191 (9th Cir. 2007) ................................................................................23, 25

*Federal Election Comm'n v. Wisconsin Right to Life, Inc.,*
    172 S.Ct. 2652 (2007)....................................................................................................35

Cases                                                                    Page(s)

*Freydel v. New York Hosp.*,
   No. 99 Civ. 7926(SHS), 2000 WL 10264  (S.D.N.Y. Jan. 4, 2000),
   *aff'd*, No. 00-7108, 2000 WL 1836755 (2d Cir. Dec. 13, 2000) ............................ 16, 28

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
   528 U.S. 167 (2000) ............................................... 21, 22, 23, 24, 26, 30, 32, 33

*Gillespie v. Dimensions Health Corp.*,
   369 F. Supp. 2d 636 (D. Md. 2005) ........................................................ 27, 28

*Gordon Grocery, Inc. v. Associated Wholesalers, Inc.*,
   478 F. Supp. 2d 838 (D. Md. 2007) .............................................................. 21

*Gregory v. Otac, Inc.*,
   247 F. Supp 2d 764 (D. Md. 2003) (Harvey, J.) ......................................... 27

*Independent Living Res. v. Oregon Arena Corp.*,
   982 F. Supp. 698 (D. Or. 1997) ................................................................... 36

*Levy v. Mote*,
   104 F. Supp. 2d 538 (D. Md. 2000) ............................................................. 26

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ........................................................................... 22, 24

*Martinez v. Longs Drug Stores, Inc.*,
   No. CIVS-03-1843DFL CMK, 2005 WL 2072013 (E.D. Cal. Aug. 25, 2005) ............ 36

*Mcready v. Standard Ins. Co.*,
   417 F. Supp.. 2d 684 (D. Md. 2006) ............................................................ 11

*O'Brien v. Werner Bus Lines, Inc.*,
   No. 94-6862, 1996 WL 82484 (E.D. Pa. Feb. 27, 1996) ............................... 27

*PGA Tour, Inc. v. Martin*,
   532 U.S. 661 (2001) ......................................................................... 12, 13

*Proctor v. Prince George's Hosp. Ctr.*,
   32 F. Supp. 2d 830 (D. Md. 1998) ......................................................... 26, 28

*Quinteros v. Sparkle Cleaning, Inc.*,
   No. AW-07-0628, 2008 WL 271730 (D. Md. Jan. 28, 2008) (Williams, J.) ................ 21

Cases                                                                                          Page(s)

Sharp v. Rosa Mexicano, D.C., LLC,
    496 F. Supp. 2d 93 (D.D.C. 2007) ......................................................................35

Sheely v. MRI Radiology Network, P.A.,
    505 F.3d 1173 (11th Cir. 2007) ........................................21, 32, 33, 34, 35

Stan v. Wal-Mart Stores, Inc.,
    111 F. Supp. 2d 119 (N.D.N.Y. 2000) ...........................................................27

Steel Co. v. Citizens for a Better Environment,
    523 U.S. 83 (1998) ...........................................................................................30

Steger v. Franco, Inc.,
    228 F.3d 889 (8th Cir. 2000) ..........................................................................26

Trafficante v. Metro Life Ins., Co,
    409 U.S. 205 (1972) .........................................................................................23

U.S. v. Concentrated Phosphate Export Ass'n.,
    393 U.S. 199 (1968) .........................................................................................22

U.S. v. W.T. Grant Co.,
    345 U.S. 629 (1953) ...............................................................31, 32, 35, 37

Wood v. Sink,
    No. 6:95CV00362, 1996 WL 544376 (M.D.N.C. July 30, 1996) ...................26

Statutes

28 U.S.C. § 2201. ...................................................................................................16

42 U.S.C. § 12101 ...................................................................................................12

42 U.S.C. § 12102 ...................................................................................................14

42 U.S.C. § 12181 ...............................................................................................1, 13

42 U.S.C. § 12182 ..............................................12, 13, 14, 15, 16, 18, 19, 20, 23, 30

42 U.S.C. § 12102(2)(A) ...........................................................................................2

**Regulations**                                                                    Page(s)

28 C.F.R. § 36.104................................................................................2, 13

28 C.F.R. § 36.201.................................................................13, 15, 18, 19, 20

28 C.F.R. § 36.202.................................................................13, 18, 19, 20

28 C.F.R. § 36.203.................................................................13, 14, 20

28 C.F.R. § 36.303.................................................................14, 15, 16, 18, 19

28 C.F.R. § 36.304.................................................................14, 18, 19

28 C.F.R. Pt. 36, App. A..........................................................................3

28 C.F.R. Pt. 36, App. B.........................................................14, 15, 16, 19, 20

**Rules**

Fed.R.Civ.P. 12(b)(1) .............................................................................21

Fed.R.Civ.P. 56.....................................................................................21

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Southern Division)

SHANE FELDMAN, *et al.*,

    Plaintiffs,

    v.                      Case No. AW-06-2266

PRO FOOTBALL, INC., *et al.*

    Defendants.

           \*   \*   \*   \*   ooo0ooo   \*   \*   \*   \*

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs, by their undersigned counsel, file this Memorandum in support of their cross-motion for summary judgment and in opposition to Defendants' Motion for Summary Judgment. As is set out below, while there are no disputes of material fact, it is Plaintiffs, not Defendants, who are entitled to judgment as a matter of law.

## BACKGROUND

Plaintiffs, Shane Feldman, Paul Singleton and Brian Kelly, are three loyal Washington Redskins fans who for years were – and still are – deprived of the full and equal enjoyment of attending Redskins home football games at FedExField by the longstanding and continuing violations of Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181 *et seq.* by Defendants Pro Football, Inc. and WFI Stadium, Inc. The record reflects that despite Defendants' home football stadium being built after the effective date of the ADA, Defendants for years did nothing to remedy the venue's

deficiencies as they relate to deaf and hard of hearing patrons. Even today, Defendants maintain that Title III of the ADA does not require them to provide auxiliary aids and services or modify their policies to provide an accessible game-day experience for their deaf and hard of hearing fans.

## UNDISPUTED FACTS

### I. PARTIES

#### A. Plaintiffs

Plaintiffs, Shane Feldman, Paul Singleton and Brian Kelly, are deaf and individuals with a disability as defined by the ADA. *See* 42 U.S.C. § 12102(2)(A); 28 C.F.R. § 36.104.

##### i. Shane Feldman

Plaintiff Shane Feldman, a passionate, long-standing Redskins fan, has been profoundly deaf since birth. Ex. 1, Feldman Answers to Interrogatories ("Interrogatory Answers") No. 7. Although Mr. Feldman uses digital hearing aids, they do not enable him to understand speech; his primary mode of communication is sign language. *Id.*, Interrogatory Answers No. 6 & 7. Assistive listening devices also do not enable Mr. Feldman to comprehend speech. *Id.* at Answer No. 6.

With his father, Mr. Feldman purchased season tickets to the Washington Redskins beginning in the 2002 season. Ex. 7 (e-mail to Todd Boyan). During the 2002, 2003 and 2005 seasons, Mr. Feldman attended every home game at FedExField. Ex. 2, Interrogatory Answers at No. 2. During the 2004 season, Mr. Feldman attended all but one of the regular season games, and in the 2006 season, Mr. Feldman attended all, or all but one, of the regular season games. *Id.* During the 2007 season, Mr. Feldman attended

five of the eight regular season games. Ex. 2A; Declaration of Shane Feldman. Mr.

Feldman also has attended some preseason games, as well as Redskins sponsored events;

in 2005, he attended an event in Virginia Beach, and he attended a training camp during

the summer of 2006. Ex. 1, Feldman Interrogatory Answer No. 3. Mr. Feldman's

devotion to the Redskins is such that he also has traveled to Redskins away games in

Buffalo, Philadelphia and Indianapolis. *Id.* at Interrogatory Answer No. 11. He intends

to continue attending Redskins games in the future. Ex. 2A, Feldman Declaration.

For years, the total lack of captioning at FedExField has diminished the

enjoyment that Mr. Feldman and other deaf and hard of hearing individuals derive from

attending Redskins football games.[1] Without captioning, deaf and hard of hearing

patrons are deprived of information that is provided to hearing patrons (*e.g.* the identity

of who carried a ball, who caught a pass, who made a tackle or who is being penalized

and for what reason). Ex. 7, 10 & 22 (Feldman e-mails). To a fan like Mr. Feldman,

such information is indispensable to the enjoyment of the game.

Moreover, as Mr. Feldman set out in his Interrogatory Answers, he is unable to

fully enjoy his experience when attending Redskins games because of his inability to

understand half-time shows, pre-game shows and the radio broadcast in the concourse

areas of the stadium. Ex. 1, Feldman Interrogatory Answer at No. 15. The same is true

of the 29 deaf individuals with whom Mr. Feldman identified as having attended football

games with him. *Id.* at Answer No. 18.

---

[1] Captioning, familiar to many from captioned television programs, is simply the verbatim, written display of aural information. 28 C.F.R. Pt. 36, App. A. ("Transcription services are used to relay aurally delivered material almost simultaneously in written form to persons who are deaf or hard of hearing.").

### ii. Paul Singleton

Plaintiff Paul Singleton was born totally deaf. Ex. 3, Singleton Interrogatory Answer No. 7. As with Mr. Feldman, assistive listening devices are of no use to Mr. Singleton. *Id.* at Answer No. 6. Mr. Singleton has purchased two Redskins season tickets each year since the team began playing at FedExField in 1997, and attends as many games per year as his home and work-lives permit. *Id.* at Answer No. 2. Like Mr. Feldman, Mr. Singleton's ability to enjoy Defendants' services, facilities, privileges, advantages and accommodations suffers because of the lack of captioning at FedExField.

### iii. Brian Kelly

Plaintiff Brian Kelly was born with a severe-to-profound hearing impairment. Ex. 4, Kelly Interrogatory Answer No. 7. He uses bilateral cochlear implants, which enable him to hear some sound, but which do not make the use of assistive listening devices at FedExField useful. *Id.* at Answers No. 6 & 7. Like Mr. Feldman and Mr. Singleton, Mr. Kelly is a committed Redskins fan. *Id.* at Answer No. 2. Mr. Kelly has attended seven games since 2004. *Id.* Just as Mr. Feldman and Mr. Singleton are unable to fully enjoy their experiences when they attend Redskins events, Mr. Kelly's game-day experience is lessened by the lack of captioning at FedExField.

### B. Defendants

Defendant Pro Football, Inc. is the franchise holder for the National Football League in the Washington, D.C. area and the owner of the Washington Redskins football team. Complaint ¶ 6; Answer ¶ 6; Defendants' Memorandum of Points and Authorities In Support of Defendants' Motion for Summary Judgment at 2 (hereafter "Defendants'

Memorandum"); Defendants' Motion for Summary Judgment at 1; Ex. 14, Answers and

Objections of Defendants Pro-Football, Inc. and WFI Stadium, Inc. to Plaintiff Paul

Singleton's First Set of Interrogatories at No. 12 (hereafter "Defendants' Answers to

Singleton Interrogatories."). Defendant WFI Stadium, Inc. is the owner and operator of

the stadium, FedExField, where the Washington Redskins have played their home games

since September 1997.[2] Complaint, ¶ 7, Answer ¶ 7, Defendants' Memorandum at page

2, Defendants' Answers to Singleton Interrogatories at No. 12.

## II.   DEFENDANTS' HISTORY OF VIOLATING TITLE III OF THE ADA AND EFFORTS TO OBTAIN COMPLIANCE.

Deaf and hard of hearing Redskins fans have a long, bitter and frustrating history

of attempting to obtain equal access to the information that is available to hearing fans.

As set out below, every attempt to obtain captioning was rejected until this lawsuit was

filed, and even then, the auxiliary aids and services provided are inadequate and

grudging. The Redskins' persistent failure to provide captioning for its deaf and hard of

hearing patrons was not because Defendants were unaware of their obligations, but

because Defendants did not want to provide captioning.

At the time FedExField opened, Defendants provided no captioning.[3] In 1999,

two years after FedExField opened, Dudley Cutshaw, a deaf individual, sent a letter to

the Redskins' stadium managers informing them that the stadium lacked captioning and

therefore violated the ADA. Ex. 6, Letter of Dudley Cutshaw. Although the letter was

---

[2] When FedExField first opened, it was called Jack Kent Cooke stadium, and the corporate owner was named JKC Stadium, Inc. P1. Ex. 19, Maryland State Dept. of Assessments & Taxation Corporate Name Change Resolution.

[3] While Defendants point to their offer of assistive listening devices, the devices are not helpful to Plaintiffs as they explained.

forwarded to an in-house attorney, Defendants took no action to remedy the discrimination.[4]  Ex. 5, Dillow Dep. at 13-14.

The Defendants' deaf and hard of hearing patrons' need for auxiliary aids and services was also identified in an e-mail exchange between a Redskins employee named Jeff Ritter, and a deaf fan named Al Sonnenstrahl, who requested that a "draft day" event be made accessible. Ex. 23, e-mail exchange. Mr. Sonnenstrahl advised Defendants that many Redskins fans are deaf or hard of hearing. *Id.* The needs of deaf and hard of hearing football fans were further discussed at a January 2003 meeting attended by Anthony Fanticola, the Redskins' director of production. Ex. 28 (meeting agenda). Ex. 8, Fanticola Dep. at 31.

In June 2003, Mr. Feldman sent an e-mail to the Redskins' ticket office identifying himself as a deaf season ticket holder for whom assistive listening devices provide no benefit and asked that Defendants caption the Jumbotron screens.[5]  Ex. 7. Mr. Feldman was initially told that the Redskins "currently do not have the capability to close caption" its video board, but that assistive listening devices were offered. Ex. 22 at page PFI 000655. Mr. Feldman wrote back, explaining that assistive listening devices would not aid him, and that during games he was "at a loss when the referees call a penalty, when a player makes a play but [he is] unable to catch their number . . ." *Id.* Mr.

---

[4] A copy of the cover memo is attached as Ex. 20. Ex. 21, Deposition of Todd Boyan at 13-14.

[5] Each Jumbotron screen is a component of a number of panels located in each end zone. The Jumbotron screen itself is a large video screen. Ex. 8, Fanticola Dep. at 21; Ex. 21, Deposition of Todd Boyan at 35-36. Next to the Jumbotron screen is a back-lit panel that has static advertising on it. Ex. 8, Fanticola Dep. at 20-21. Next to one of the back-lit panels is a multi-color scoreboard. *Id.* Next to that is another back-lit advertising panel. *Id.* A photograph of a Jumbotron screen and its associated components is attached at Ex. 11.

Feldman's e-mail was first sent to Todd Boyan, then vice president of operations for

FedExField and then forwarded to Boyan's supervisor, Michael Dillow, the Redskins'

senior vice president for operations.[6]  Ex. 21, Boyan Dep. at 6-7.  In a July 2003 e-mail to

Mr. Feldman, Mr. Boyan said that the Redskins were "exploring all the options related to

potentially providing" captioning on the scoreboards.  Ex. 10 at PFI 000108.

In subsequent e-mails from Mr. Feldman to Mr. Boyan during the summer of

2003, Mr. Feldman offered to meet with Mr. Boyan.  *Id.*  When Mr. Feldman was

informed that there was no stadium disability access committee, Mr. Feldman asked to be

part of one.  *Id.*  Mr. Boyan refused, telling Mr. Feldman that "we already have

consultants advising us on disability issues."  *Id.* at PFI 000108 & 000109.

While Mr. Feldman and Mr. Boyan were exchanging e-mails, director of

production Anthony Fanticola investigated the possibility of captioning the Jumbotron

screens.  Ex. 21, Boyan Dep. at 18.  Within weeks of receiving Mr. Feldman's e-mail, the

Redskins learned that with an investment of approximately $22,000.00, the Jumbotron

could be captioned.  Ex. 9 (Memo from Anthony Fanticola to Todd Boyan with price

quote); Ex. 5, Dillow Dep. at 21 & 31.  This information was passed on to Fanticola's

superiors in July 2003.  *Id.*  Despite the low cost, Defendants chose not to caption the

Jumbotrons, or provide any other captioning during the 2003 season.  Ex. 10, Shane

Feldman e-mail.  Defendants did, however, misleadingly inform Mr. Feldman that the

Jumbotrons in place could not be captioned.  Ex. 22.

---

[6] Mr. Dillow, who testified as the designee witness of both Defendants, is the senior vice
president for operations. Ex. 5, Michael Dillow Dep. at 6.  Among other things, Mr.
Dillow is responsible for game-day operations at FedEx Field. *Id.* at 7.  He began in his
present job when Daniel Snyder became principal owner of the Redskins. *Id.* at 7-8.

In January 2004, Mr. Feldman resumed his communications with Mr. Boyan.  On January 16, 2004, Mr. Feldman wrote that "I was disappointed to bring my family and friends to 2003 games only to be denied access to the audio announcements to the game." Ex. 10.  Mr. Feldman concluded his e-mail with a plea to "ensure my safety and to allow me access to the full breadth of the enjoyment of a Redskin fan as a season ticket holder and loyal fan, could you please consider adopting captioning technology for the big screen at Redskin stadium for the 2004 season?"  *Id.*  Mr. Feldman became most concerned for his safety during an incident in 2002 in which pepper spray was released at the stadium and Mr. Feldman could not hear the instructions provided to hearing fans over the public address system.  *Id.*  Mr. Feldman's plea led only to the brief response that the Redskins would "look into captioning and any other option that may address this issue."  *Id.*  Before the 2004 season began, Mr. Fanticola sent Mr. Boyan a memo discussing what was necessary to caption the Jumbotron screens.  Ex. 12.

There was no captioning at FedExField during the 2004 football season because as Mr. Dillow testified, "we didn't think it was the appropriate answer in our stadium." Ex. 5, Dillow Dep. at 36.

Following the 2004 season, the Redskins again did nothing to provide captioning. Their studied inaction was tersely made known to Mr. Feldman with a June 2005 e-mail from Mr. Boyan saying only that "At this time there are no plans for captioning the Jumbotrons." Ex. 27.  Defendants also did not provide any captioning during the 2005 season.  Ex. 5, Dillow Dep. at 41.

In February 2006, the National Association of the Deaf ("NAD") wrote a letter to Mr. Daniel Snyder, principal owner of Defendants, seeking the captioning of aural

8

information at FedExField. Ex. 13. In March 2006, Mr. Boyan left Defendants' employ, and there were still no plans in place to provide any captioning. Ex. 21, Boyan Dep. at 58-59. That same month, the Redskins acknowledged the NAD's letter. Ex. 30. By August 2006, with the football season approaching, and not having heard of any plans to provide auxiliary aids and services or make other modifications in the foreseeable future, Plaintiffs filed this lawsuit.

After Plaintiffs filed this lawsuit, Defendants began to caption their pre-game emergency evacuation instruction video and developed standard captioned emergency instructions for use during games. Ex. 2 to Defendants' Memorandum, Declaration of Scott Edwards at ¶ 9. In October 2006, Defendants began providing some captioning at FedExField. Announcements and officials' calls made over the stadium public address system were captioned on two "ribbon boards" on the façade of the club level of the stadium at the 50-yard-line. Ex. 1 to Defendant's Memorandum, Declaration of Michael Dillow at ¶ 3.[7] All advertising was either captioned on the Jumbotron screens or live captioned on the ribbon boards. Ex. 2 to Defendants' Memorandum, Declaration of Scott Edwards at ¶ 9. The cost of the hardware that Defendants purchased to provide this captioning was less than $5,000.00. Ex. 5, Dillow Dep. at 27. The team pays $550.00 per game – or $5,500.00 per year – to employ a stenocaptioner to do the live captioning. *Id.* Defendants also caption the spirit song "Hail to the Redskins" and the National Anthem on the scoreboard, as they did before this suit was filed, but no other song lyrics are captioned. *Id.* at 91-92. The reason that Defendants do not caption other lyrics is that they subjectively believe that it is "not appropriate" to do so. *Id.* at 92.

---

[7] Defendants already owned the ribbon boards when they began to use them for this purpose. Ex. 5, Dillow Dep. at 33-35.

In the concourse areas, there are numerous television sets stationed around the concession stands.  Before October 2006, all televisions were turned to the in-house stadium feed of what was being shown on the Jumbotron.  The concourse public address system carried the radio station program of the Redskins game live.  After Plaintiffs filed this lawsuit, in November 2006, Defendants switched half of the televisions in the concourse areas to the network television feed of the game with the sound muted and the captioning turned on.  Ex. 31, Defendants Answers to Shane Feldman Interrogatories Answer No. 10.  The remainder of the televisions continued to display the in-house stadium feed, and hearing patrons still enjoy the radio station audio that is broadcast throughout the concourse areas.  Ex. 5, Dillow Dep. at 51-52.

Defendants admit that it is possible to caption the radio station audio and therefore make that content as available for deaf and hard of hearing patrons as it is for hearing patrons.  Ex. 14, Defendants Answers to Singleton's Interrogatories at No. 4; Ex. 5, Dillow Dep. at 50.  Defendants state that "although they do not contend that doing so would be unaffordable, captioning of the Redskins Radio play-by-play . . . would be wasteful and wholly unnecessary. . ." because the captioned network feed is displayed in the concourse areas.  Ex. 14, Defendants' Answers to Singleton's Interrogatories at No. 4.

During the 2006 football season, Plaintiffs retained expert Larry Goldberg.  Ex. 26.  Mr. Goldberg founded the nation's only research and development center dedicated to making new media technologies accessible to individuals with disabilities.  Ex. 18, Goldberg CV.  He additionally provides leadership for research, outreach, policy and standards initiatives with public-and private-sector partners that impact how, when and where people of all ages and abilities gain access to information, education, employment

and entertainment. *Id.* Mr. Goldberg attended a home football game at FedExField and produced a report outlining what audio content at FedExField is available to deaf and hard of hearing patrons, and what is not. [8] Mr. Goldberg's report contained a number of recommendations to improve the experience at FedExField for deaf and hard of hearing fans, using as its guiding principle that "if audio is heard by a hearing person, then it has some reason for being projected; and, therefore, a deaf person should have equal access to it." Ex. 17, Goldberg Dep. at 59. Defendants have not followed all of these recommendations. Instead, during the 2007 football season, Defendants continued to take the same, inadequate measures that they took in the 2006 season.

## STANDARD OF REVIEW ON SUMMARY JUDGMENT

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A material fact is one that may affect the outcome of the suit. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

If, as in this case, both parties file dispositive motions, each motion is to be determined by its appropriate standard of review. *Cf. McCready v. Standard Ins. Co.*, 417 F. Supp. 2d 684, 695 (D. Md. 2006) (setting out standards for deciding cross-motions for summary judgment).

---

[8] Ex. 24. The report was originally provided to Defendants during settlement discussions. Ex. 26 (expert identification noting report was previously provided).

In this case, as set out below, the appropriate standard to determine Defendants' Motion is that applied to a Rule 12(b)(1) motion to dismiss for lack of jurisdiction or mootness, while Plaintiffs' Motion should be determined under Rule 56.

## ARGUMENT

## I. PLAINTIFFS ARE ENTITLED TO DECLARATORY AND INJUNCTIVE RELIEF FOR DEFENDANTS' VIOLATIONS OF THE ADA.

Plaintiffs demonstrate in their statement of undisputed facts that for 10 years the owners, operators and lessees of FedExField knowingly violated the requirements of Title III of the ADA which mandates that places of public accommodation be accessible to deaf and hard of hearing patrons.  42 U.S.C. § 12182.  Plaintiffs will explain why they are entitled to summary judgment on their claims for declaratory relief with respect to captioning that Defendants have belatedly and inadequately provided, and why they are entitled to injunctive and declaratory relief on their claims for additional auxiliary aids and services that are required to bring Defendants into full compliance with Title III of the ADA.

### A. Plaintiffs Are Entitled to Declaratory Relief Because Defendants Have Refused to Admit That Title III of the ADA Mandates That FedExField Be Accessible to Individuals Who Are Deaf or Hard of Hearing.

Congress enacted the Americans with Disabilities Act in 1990 "to remedy widespread discrimination against disabled individuals." *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 674 (2001).  Congress found that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem."  42 U.S.C. § 12101(a)(2); *PGA Tour*, 532 U.S. at 674-75.  Congress concluded that there was a "'compelling need to provide a clear and comprehensive

national mandate' to eliminate discrimination against disabled individuals and integrate

them 'into the economic and social mainstream of American life.'" *Id.* at, 675 (quoting

S. Rep. No. 101-116, at 20 (1989); H.R. Rep. No. 101-485, at 50 (1990)).

Title III of the ADA was enacted to facilitate disabled individuals' access to

places of public accommodation including stadiums such as FedExField. 42 U.S.C. §

12181(7)(C) (listing stadiums as covered entities); 28 C.F.R. § 36.104 (same). Consistent

with its goal of integration, Title III states broadly:

> No individual shall be discriminated against on the basis of disability in
> the full and equal enjoyment of the goods, services, facilities, privileges,
> advantages, or accommodations of any place of public accommodation by
> any person who owns, leases (or leases to), or operates a place of public
> accommodation.

42 U.S.C. § 12182(a); *see also* 28 C.F.R. § 36.201(a); *PGA Tour*, 532 U.S. at 676.

Title III explicitly defines discrimination. Discrimination occurs when a place of

public accommodation denies an individual with a disability the opportunity to

"participate in or benefit from [its] services, facilities, privileges, advantages, or

accommodations." 42 U.S.C. § 12182(b)(1)(A)(i); 28 C.F.R. § 36.202(a).

Discrimination also occurs when a place of public accommodation provides an individual

with a disability an unequal opportunity to participate in or benefit from its services,

facilities, privileges, advantages, and accommodations. 42 U.S.C. § 12182(b)(1)(A)(ii);

28 C.F.R. § 36.202(b). Notwithstanding the existence of separate benefits, individuals

with a disability must be provided "the opportunity to participate in such programs or

activities that are not separate or different." 42 U.S.C. § 12182(b)(1)(C); 28 C.F.R. §

36.203(b); *see also* 28 C.F.R. § 36.203(c). Places of public accommodation must provide

auxiliary aids and services in the most integrated setting appropriate to the needs of an individual with a disability.  42 U.S.C. § 12182(b)(1)(B); 28 C.F.R. § 36.203(a).

These antidiscrimination provisions place affirmative obligations on places of public accommodation to provide auxiliary aids and services to ensure that an individual with a disability is not "excluded, denied services, segregated or otherwise treated differently."  42 U.S.C. § 12182(b)(2)(A)(iii); 28 C.F.R. § 36.303(a).  Places of public accommodation also must make reasonable modifications in policies, procedures, and practices and remove communication barriers to ensure equal access.  42 U.S.C. § 12182(b)(2)(A)(ii), (iii); 28 C.F.R. § 36.304(a).

Places of public accommodation are specifically obligated to provide auxiliary aids and services to ensure effective communication with individuals who are deaf or hard of hearing.  42 U.S.C. § 12102(1)(A); 28 C.F.R. § 36.303(c); *see also* 28 C.F.R. Pt. 36, App. B (explaining that Title III "requires that appropriate auxiliary aids and services be furnished to ensure that communication with persons with disabilities is as effective as communication with others").  Auxiliary aids and services include, but are not limited to:

> Qualified interpreters, notetakers, *computer-aided transcription services*, written materials, telephone handset amplifiers, assistive listening devices, assistive listening systems, telephones compatible with hearing aids, closed caption decoders, *open and closed captioning*, telecommunications devices for deaf persons (TDDs), *videotext displays*, or other effective methods of making aurally delivered materials available to individuals with hearing impairments.

28 C.F.R. § 36.303(b)(1) (emphases added); *see also* 28 C.F.R. Pt. 36, App. B ("Transcription services are used to relay aurally delivered material almost simultaneously in written form to persons who are deaf or hard of hearing.  This technology is often used at conferences, conventions, and hearings.").  The

regulation makes clear that "aurally delivered materials" includes even "nonverbal sounds and alarms and computer-generated speech." 28 C.F.R. Pt. 36, App. B.

As a covered entity, FedExField is obligated to provide auxiliary aids and services for deaf and hard of hearing patrons so that they may share in the "full and equal enjoyment" of all that the stadium has to offer to its hearing fans. 42 U.S.C. § 12182(a); 28 C.F.R. 36.201(a); *see also* 28 C.F.R. § 36.303(c); *cf.* 28 C.F.R. Pt. 36, App. B ("[P]ublic accommodations that impart verbal information through soundtracks on films, video tapes, or slide shows are required to make such information accessible to persons with hearing impairments.").

FedExField features a public address system in the stadium bowl (the "stadium public address system") and a public address system in the concourse areas of the stadium (the "concourse public address system") (collectively, the "public address systems"). The stadium public address system provides aurally delivered materials including, but not limited to, information about the football game in progress, half-time entertainment, and song lyrics that enhance and enrich the game-day experience of hearing fans. The stadium public address system further provides safety instructions including how to evacuate the stadium in the event of disaster. Fans who are deaf or hard of hearing, however, cannot hear or understand the stadium public address system. Defendants are consequently obligated to provide auxiliary aids and services to make the aurally delivered material conveyed by the stadium public address system fully accessible to individuals who are deaf or hard of hearing. 42 U.S.C. § 12182; 28 C.F.R. § 36.303.

The technology exists today to make the aurally delivered material conveyed by the stadium public address system at FedExField fully accessible to deaf and hard of hearing individuals in real time.[9] The Department of Justice has explained that "[t]ranscription services are used to relay aurally delivered material almost simultaneously in written form to persons who are deaf or hard of hearing." 28 C.F.R. Pt. 36, App. B. The Department of Justice has further observed that "[v]ideotext displays have become an important means of accessing auditory communications through a public address system." 28 C.F.R. Pt. 36, App. B. Defendants have not only conceded that they could caption the stadium public address system, but have in fact hired a stenocaptioner to provide some real-time transcription for deaf and hard of hearing fans. Despite these concessions, Defendants do not acknowledge that they are required to caption any of the aurally delivered materials conveyed through the stadium public address system as they are required to do so under Title III. Defendant's Memo at 7 & 8. 42 U.S.C. § 12182; 28 C.F.R. § 36.303. Plaintiffs are, therefore, entitled to a declaration of their rights under the ADA that Defendants are required to make their place of public accommodation fully accessible to people who are deaf or hard of hearing. 28 U.S.C. § 2201.

### B. Plaintiffs Are Entitled To Declaratory and Injunctive Relief Because Defendants Have Not Made FedExField Fully Accessible To Deaf and Hard of Hearing Patrons.

In addition to refusing to admit that FedExField must be accessible to the deaf and hard of hearing – and that Title III requires Defendants to do what little captioning they are doing now – there are significant ways in which FedExField still is not accessible as required by law. Plaintiffs will address each issue.

_____

[9] The same technology exists to caption the concourse public address system. That is addressed in section b iii, *infra*.

### i. Line of Sight Violations

Deaf and hard of hearing individuals are unable to see both a Jumbotron screen and a ribbon boards at the same time. What limited captioning Defendants provide is displayed on ribbon boards at the 50-yard line. The Jumbotrons are located at the end zones. Since the Jumbotron and the captions are not in the same line of sight, Plaintiffs often miss what is being said or displayed because it is physically impossible to see or attend simultaneously to captions on the 50-yard-line and corresponding video in the end zone. Plaintiffs' access is not equal to that of hearing fans, who can watch the Jumbotron while listening to the audio describing instant replays and other action being shown on the screen. Ex. 24, Goldberg Report.

Mr. Goldberg states in his expert report that situating ribbon boards next to the Jumbotron makes the aurally delivered materials fully accessible to Plaintiffs. As Mr. Goldberg testified, if there is audio that is accompanied by a video, then in order for a deaf or hard of hearing fan to see both the audio displayed as captions and the video at the same time, the captions need to be located on or near the video presentation. Ex. 17, Goldberg Dep. at 56. Mr. Goldberg suggested two alternatives to placing ribbon boards on the 50-yard-line. First, Defendants could put the captioning on the Jumbotron. Ex. 24, Goldberg Report. Alternately, Defendants could place ribbon boards adjacent to the Jumbotron screens. Ex. 24, Goldberg Report. Defendants have, however, refused to adopt either measure.[10] Because Plaintiffs cannot see the captions on the 50-yard-line,

---

[10] In their only argument on the merits in their memorandum, Defendants contend that they are not required to caption the Jumbotron screens. Defendants cite to inapposite portions of a magistrate opinion that were not adopted by the district court. Defendants' Memorandum at 13 n.6 (citing *Cornilles v. Regal Cinemas, Inc.*, No. Civ. 00-173-AS, 2002 WL 31440885 (D. Or. Jan. 3, 2002), *report adopted in part*, No. Civ. 00-173-AS,

while also watching the Jumbotron in the end zone, the limited auxiliary aids that Defendants do provide do not result in the effective communication of aurally delivered materials required under Title III.  42 U.S.C. § 12182; 28 C.F.R. § 36.201, 36.202, 36.303, 36.304.

As a result of Defendants' failure to afford Plaintiffs an adequate line of sight between the ribbon boards and the Jumbotrons, Plaintiffs are entitled to declaratory and injunctive relief.

### ii. Entertainment Accompanying the Football Game

In addition to the football game itself, Defendants, like all NFL teams, provide other game-day entertainment.  Included as part of that entertainment is pre-game and half-time entertainment, such as events honoring retired players.  Also part of the entertainment package is music with lyrics that are audible to fans in the stadium bowl. Ex. 21, Boyan Dep. at 61-62.  Defendants caption the "Star-Spangled Banner" and "Hail to the Redskins," but do not caption the lyrics to any other songs that are played as part of the game-day entertainment, including before the game and during the half-time show. Ex. 5, Dillow Dep at 71-72, 91 (Star-Spangled Banner and Hail to the Redskins are captioned, but no other song lyrics are captioned).  Defendants refuse to caption the lyrics, and therefore continue to violate Title III's requirement that places of public accommodation provide an individual with a disability the necessary auxiliary aids and services to ensure full and equal enjoyment of the game-day experience provided to

---

2002 WL 31469787 (D. Or. Mar. 19, 2002).  The issue here is not whether Defendants have to give primary consideration to Plaintiffs' preferred form of accommodation, but whether Defendants failed have to provide necessary auxiliary aids and services to ensure effective communication for deaf and hard of hearing patrons.  42 U.S.C. § 12182; 28 C.F.R. § 36.303.

hearing fans. 42 U.S.C. § 12182; C.F.R. §§ 36.201, 36.202, 36.303, 36.304; Ex. 17,

Goldberg Dep. at 89. Title III regulations make clear that covered entities must make *all*

aurally delivered materials accessible, including "nonverbal sounds and alarms and

computer-generated speech." 28 C.F.R. Pt. 36, App. B.

As a result of Defendants' failure to caption all aural information disseminated

throughout the course of providing its services, facilities, privileges, advantages, and

accommodations, Plaintiffs are entitled to declaratory and injunctive relief.

### iii. Defendants Must Caption the Radio in the Concourse Areas

For the benefit of hearing fans, Defendants play the radio network that broadcasts

the Redskins home games over the concourse public address system. Ex. 5, Dillow Dep.

at 98. The local radio station that broadcasts the game is WBIG, and Defendants refer to

the owner of that and some companion stations as "Red Zebra." Ex. 5, Dillow Dep. at

51.

Defendants concede that they could caption fully the radio by displaying captions

on the television monitors in the concourse areas that currently display the Jumbotron

picture. Ex. 14, Defendants' Answers to Singleton Interrogatories at No. 4; Ex. 5, Dillow

Dep. at 50; Ex. 16 (e-mail). Because these television screens are not currently

accompanied by any sound or captioning, they are available to caption the "Red Zebra"

broadcast. In fact, in 2006, Defendants obtained proposals for the hardware and

communications equipment they would need to caption the radio broadcast, but decided

not to provide the service. Ex. 16. Simply explained, Defendants could provide

captioning by feeding the "Red Zebra" broadcast to a stenographer who would provide

captions of the radio broadcast to the available television screens. Ex. 16. The

stenographer used by Defendants testified that captioning radio can be done and, in fact, he has captioned local radio.  Ex. 29, Steven Clark Dep. at 30.

Defendants' actions provide unequal access for deaf and hard of hearing fans since, as Defendants themselves acknowledge, hearing fans prefer the radio broadcast, which features commentators Sonny Jurgenson, Sam Huff and Larry Michael, to network television commentary.  Ex. 15 (e-mail); Ex. 5, Dillow Dep. at 52-53.  Captioning only the network television feed runs afoul of Title III's prohibition on providing separate and unequal benefits to individuals with disabilities.  42 U.S.C. § 12182(a); 42 U.S.C. 12182(b)(1)(A)(ii), (iii); 28 C.F.R. §§ 36.201(a), 36.202(b), (c); *see also* 28 C.F.R. Pt. 36, App. B ("Providing segregated accommodations and services relegates persons with disabilities to the status of second-class citizens.").  Notwithstanding the existence of the separate network television feed, Defendants must provide the Plaintiffs with equal access to the radio broadcast.  42 U.S.C. § 12182(b)(1)(A)(i), (ii); 42 U.S.C. § 12182(b)(1)(C); 28 C.F.R. § 36.202(b); 28 C.F.R. § 36.203(b); *cf.* 28 C.F.R. Pt. 36, App. B ("[P]ersons with disabilities must not be limited to certain performances at a theater."); 28 C.F.R. Pt. 36, App. B ("[P]ublic accommodations must take steps necessary to ensure that an individual with a disability will not be excluded, denied services, segregated or otherwise treated differently from other individuals because of the use of inappropriate or ineffective auxiliary aids.").

Due to Defendants' complete failure to caption the Red Zebra radio broadcast, Plaintiffs are entitled to declaratory and injunctive relief.

## II.   DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT EITHER BASED ON AN ALLEGED LACK OF STANDING OR ON THE GROUNDS THAT PLAINTIFFS' CLAIMS ARE MOOT.

### A. Defendants Filed Their Motion to Dismiss Under the Wrong Rule of Civil Procedure.

Defendants filed their motion to dismiss under the wrong rule of civil procedure. Defendants improperly moved for summary judgment pursuant to Fed. R. Civ. P. 56, which is not the appropriate rule when challenging the Court's jurisdiction to entertain a case. Instead, Defendants' claims are more appropriately governed by Fed. R. Civ. P. 12(b)(1), the rule governing motions to dismiss for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1); *Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1182 (11th Cir. 2007) (noting that Rule 12(b)(1), and not Rule 56, governs the disposal of cases for lack of subject matter jurisdiction); *Gordon Grocery, Inc. v. Associated Wholesalers, Inc.*, 478 F. Supp. 2d 838, 840 n.1 (D. Md. 2007) (Davis, J.) (stating that a motion alleging a lack of subject matter jurisdiction is considered under the rubric of Rule 12(b)(1)); *see also Quinteros v. Sparkle Cleaning, Inc.*, No. AW-07-0628, 2008 WL 271730, at *2-*3 (D. Md. Jan. 28, 2008) (Williams, J.).

As a result of citing the wrong rule of civil procedure, Defendants state the incorrect governing standards. Under Fed. R. Civ. P. 56., summary judgment is appropriate when there are no genuine issues of material fact in dispute. *Celotex Corp.*, 477 U.S. at 322-23. This is not the applicable standard for determining whether Plaintiffs have standing. Rather, Plaintiffs must demonstrate that they have suffered injury in fact, that there is a causal relationship between Defendants' conduct and Plaintiffs' harm, and that the harm is redressable by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000). Further, Defendants incorrectly

suggest that Plaintiffs bear the burden of establishing that this case is not moot.  Rather,

"a defendant claiming that its voluntary compliance moots a case bears the formidable

burden of showing that it is absolutely clear the allegedly wrongful behavior could not

reasonably be expected to recur."  *Id.,* at 190 (citing *U.S. v. Concentrated Phosphate*

*Export Ass'n.*, 393 U.S. 199, 203 (1968)).  Thus, *Defendants*, not Plaintiffs, bear the

heavy burden of demonstrating that this case is moot.

> **B.  Plaintiffs Have Standing Because They Were Suffering Redressable**
> **Injuries In Fact Due to Defendants' Discriminatory Conduct at the Time**
> **They Filed Their Complaint.**

To have standing to bring a case, a plaintiff must satisfy three criteria at the time

litigation *commences*: (1) an injury in fact that is both concrete and particularized, as well

as actual or imminent; (2) there must be a causal connection between the injury and the

conduct in question;[11] and (3) it must be likely that the injury will be redressed by a

favorable decision.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61, 571 n.5 (1992);

*Friends of the Earth*, 528 U.S. at 189, 191.  Plaintiffs were suffering an injury in fact at

the time this action commenced since they were personally attending Redskins games at

FedExField, yet were unable to fully understand the events taking place because

Defendants failed to caption the aural information that was being disseminated

throughout the stadium.  Ex. 7, 10 & 22 (Feldman e-mails).  Plaintiffs further suffered,

and continue to suffer, injuries in fact as a result of Defendants' failure to provide

captioning in the same line of sight as the Jumbotron screens and to caption music lyrics

and the "Red Zebra" radio broadcast.  In other words, Plaintiffs suffered, do suffer and

will continue to suffer injuries in fact as a result of Defendants' failure to comply with the

---

[11] As noted, Defendants' actions and inactions, such as refusing to provide captioning, have caused the harm that led Plaintiffs to file this suit.

ADA's requirement that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation . . . ." 42 U.S.C. § 12182(a).  Lastly, this Court can redress Plaintiffs' injuries with injunctive equitable and declaratory relief because Defendants refused, and continue to refuse, to provide Plaintiffs with appropriate modifications and auxiliary aids and services and make reasonable modifications.  Therefore, Plaintiffs have amply demonstrated that they maintain standing to bring this cause of action.[12]

> i.  **Defendants Impermissibly Conflate the Standard Governing Mootness With The Standard Governing Standing.**

Despite the inescapable conclusion that Plaintiffs have standing to bring this case, Defendants incorrectly reached an alternate conclusion by conflating standing and mootness.  Standing is "the requisite personal interest that must exist at the *commencement* of the litigation."  *See Friends of the Earth*, 528 U.S. at 189 (emphasis added) (quotation marks omitted); *see also Becker v. Fed. Election Com'n*, 230 F.3d 381, 387 n.3 (1st Cir. 2000) ("[W]hile it is true that a plaintiff must have a personal interest at stake throughout the litigation of a case, such interest is to be assessed under the rubric of standing at the commencement of the case, and under the rubric of mootness thereafter.").[13]

---

[12] It is noteworthy that "[t]he Supreme Court has instructed [lower courts] to take a broad view of constitutional standing in civil rights cases, especially where, as under the ADA, private enforcement suits 'are the primary method of obtaining compliance with the Act.'" *Doran v. 7-Eleven, Inc.*, 506 F.3d 1191, 1195 (9th Cir. 2007) (quoting *Trafficante v. Metro. Life Ins. Co.*, 409 U.S. 205, 209 (1972)).

[13] Moreover, the Defendants contend that "mootness represents a time dimension of standing," despite the Supreme Court's statement that this "description of mootness . . . is not comprehensive." *Friends of the Earth*, 528 U.S. at 189.  For this proposition, the Defendants cite *Bethlehem Steel Corp. v. Kreps*, an unpublished disposition of this Court

Nevertheless, Defendants argue that Plaintiffs Feldman, Singleton, and Kelly do not have standing to seek injunctive relief because Defendants took *some* remedial action *after* this lawsuit was filed. This argument is misplaced because Plaintiffs' standing to bring this suit rests on the injuries that Plaintiffs were suffering *at the time* this cause of action commenced, as well as those injuries that Plaintiffs continue to suffer. *Lujan*, 504 U.S. at 571 n.5. This Court is able to provide Plaintiffs with injunctive and declaratory relief based on Defendants' long-standing discriminatory practices at the time this case commenced.

> ii.    **Plaintiffs Have Suffered An Injury In Fact Due to Defendants' Discriminatory and Illegal Conduct in Denying Plaintiffs the Opportunity to Enjoy FedExField's Services, Facilities, Privileges, Advantages, and Accommodations.**

Plaintiffs have standing to bring this complaint because Defendants were discriminating against Plaintiffs at the time Plaintiffs filed this suit. To have standing, an individual must have suffered an injury that was both concrete and particularized, as well as actual or imminent. *Lujan*, 504 U.S. at 560. An injury is concrete when it is "certainly impending," because a plaintiff will endure future injury absent the initiation of suit. *Id.* at 567 n.3; *see also Friends of the Earth*, 528 U.S. at 191-92 (stating that "[s]tanding doctrine functions to ensure . . . that the scarce resources of the federal courts are devoted to those disputes in which the parties have a concrete stake"). A plaintiff suffers an actual or imminent injury when he "is threatened with harm in the future because of

---

that is more than 25 years old. No. Y-78-837, 1980 WL 140, at *7 (D. Md. May 8, 1980) (Young, J.). However, the reasoning in *Bethlehem Steel* has subsequently been rejected by the Supreme Court of the United States. *See Friends of the Earth*, 528 U.S. at 189. The *Friends of the Earth* Court explained that "if mootness were simply 'standing set in a time frame,' the exception to mootness that arises when the defendant's allegedly unlawful activity is capable of repetition, yet evading review,' could not exist." *Id.*

existing or imminently threatened non-compliance with the ADA." *Doran*, 506 F.3d at 1196 (citation omitted).

At the time that Plaintiffs filed this action on August 31, 2006, Defendants were denying the long-standing requests for auxiliary aids and services and modifications that would enable Plaintiffs and other deaf and hard of hearing individuals to enjoy the services offered by Defendants in the same manner that hearing patrons enjoy them. *See* Undisputed Facts § II, *supra*. Therefore, as a result of Defendants' actions – or rather Defendants' inaction – none of the Plaintiffs were able to benefit from the full and equal enjoyment of the services, facilities, privileges, advantages, and accommodations that Defendants offer. Despite these ongoing and discriminatory practices, Plaintiffs had, and continue to maintain, repeated plans to attend football games at FedExField, each time being faced with Defendants' noncompliance with the ADA, and therefore a lesser game day experience. Ex. 2A-2C.

Given Defendants' refusal to discontinue any of their discriminatory practices at the time this suit was filed, Plaintiffs were certain to continue suffering their injuries absent this litigation. Ex. 1, Feldman Answers to Interrogatories; Ex. 3, Singleton Answers to Interrogatories; Ex. 4, Kelly Answers to Interrogatories. Defendants' refusal, along with the harm that Plaintiffs suffered each time they attended a football game at FedExField, and their certain plans to attend future events at FedExField, demonstrate that Plaintiffs have suffered a concrete and particularized, actual and imminent, injury in fact. That Defendants complied with *some* of Plaintiffs' requests *after* the initiation of this suit is irrelevant because subsequent measures do not result in a lack of standing. *Lujan*, 504 U.S. at 571 n.5 (noting that "standing is to be determined as of the

commencement of suit"); *see also Steger v. Franco, Inc.*, 228 F.3d 889, 893 (8th Cir. 2000) ("[S]tanding is based on the facts as they existed at the time the lawsuit was filed."); *Advanced Mgmt. Tech., Inc. v. F.A.A.*, 211 F.3d 633, 636 (D.C. Cir. 2000) ("Standing is assessed 'at the time the action commences'") (quoting *Friends of the Earth*, 528 U.S. at 191).

Despite this well-established rule, Defendants incorrectly claim that Plaintiffs do not have standing because of Defendants' subsequent remedial action, citing a number of cases that are inapposite to their claims. Throughout the cases that Defendants cite, the plaintiffs did not lack standing due to subsequent action taken by the respective defendants, but because the plaintiffs were unable to articulate a particularized or concrete injury. The plaintiffs lacked ongoing, concrete and particularized injuries because they were unable to establish that they had any intention of availing themselves of the services offered by the defendants in the future. *See Levy v. Mote*, 104 F. Supp. 2d 538, 545 (D. Md. 2000) (Harvey, J.) (holding that the plaintiff lacked standing because he did not attempt to patronize the defendant's facility after filing an amended complaint); *Proctor v. Prince George's Hosp. Ctr.*, 32 F. Supp. 2d 830, 833 (D. Md. 1998) (Chasanow, J) (holding that the plaintiff lacked standing because the plaintiff was not likely to return to the defendant's facility in the near future); *Freydel v. New York Hosp.*, No. 99 Civ. 7926(SHS), 2000 WL 10264, at *3 (S.D.N.Y. Jan. 4, 2000) (holding that the plaintiff lacked standing because she was unlikely to return to defendants' facility in the future), *aff'd*, No. 00-7108, 2000 WL 1836755 (2d Cir. Dec. 13, 2000); *Wood v. Sink*, No. 6:95CV00362, 1996 WL 544376, at *3 (M.D.N.C. July 30, 1996) (holding that the plaintiffs lacked standing because there were no allegations of future contact between the

plaintiffs and the defendant realtors); *O'Brien v. Werner Bus Lines, Inc.*, No. 94-6862, 1996 WL 82484, at *4 (E.D. Pa. Feb. 27, 1996) (holding that plaintiffs lacked standing because they were not likely to use the defendants' buses in the future). In the remainder of the cases that Defendants cited, the plaintiffs lacked standing because they were not suffering an injury in fact at the time the cause of action *commenced*. *Gregory v. Otac, Inc.*, 247 F. Supp. 2d 764, 771 (D. Md. 2003) (Harvey, J.) (holding that the plaintiff lacked standing to allege a violation of the ADA due to a lack of wheelchair access because there was a wheelchair ramp in place prior to the filing of suit); *Banchieri v. City of New York*, No. 01 CV 1853(HB), 2001 WL 1018351, at *3 (S.D.N.Y. Aug. 31, 2001) (holding that the plaintiff lacked standing because the defendants were not discriminating against her at the time that she filed suit); *Stan v. Wal-Mart Stores, Inc.*, 111 F. Supp. 2d 119, 125 (N.D.N.Y. 2000) (holding that the plaintiff lacked standing because the defendant had modified its policy prior to the filing of suit). By contrast, all three Plaintiffs are loyal fans who fully intend to regularly avail themselves of Defendants' services indefinitely. Moreover, Plaintiffs were suffering injury in fact because at the time Plaintiffs filed this complaint, Defendants had not taken a single measure to provide auxiliary aids and services or otherwise modify their policies, practices or procedures in compliance with Title III of the ADA.

Defendants do not cite the most relevant decision from this Court, *Gillespie v. Dimensions Health Corp.*, 369 F. Supp. 2d. 636 (D. Md. 2005). In *Gillespie*, Judge Chasanow made the distinction that Defendants failed to make – that a plaintiff's real and immediate injury hinges on whether the plaintiff is likely to suffer cognizable harm in the future. *Id.* at 645. In *Gillespie*, deaf plaintiffs filed suit against Laurel Regional Hospital

for refusing to provide auxiliary aids and services to ensure effective communications between plaintiffs and medical personnel when the plaintiffs received medical treatment at the Hospital. *Id.* at 637. The Court held that the plaintiffs had standing because they lived in close proximity to the hospital and planned to continue to avail themselves of defendants' medical services. *Id.* at 645. In addition, the Court distinguished two of the cases on which Defendants rely: *Proctor* and *Freydel*. *Id.* at 642-44. The Court held that these cases were inapposite to the defendant's attack on the plaintiffs' standing because those plaintiffs had only minimal contact with defendants before the incidents at issue and were unlikely to have further association with the defendants. *Id.* This was unlike the plaintiffs in *Gillespie* who had repeated contact with the defendants prior to initiating suit, and who were likely to seek the defendant's services in the future. *Id.* at 645.

Like the plaintiffs in *Gillespie*, and unlike the plaintiffs in *Proctor* and *Freydel*, Plaintiffs are likely to avail themselves of Defendants' services in the future. In fact, Plaintiffs are even more likely to avail themselves of Defendants' services than were the plaintiffs in *Gillespie* because Plaintiffs either hold renewable season ticket passes to attend, or regularly attend, Washington Redskins football games. Answer at ¶ 17; Ex. 1, 3 & 4 , Plaintiffs' Interrogatory Answers; Ex. 2A and 2C. The plaintiffs in *Gillespie* will only avail themselves of the defendant's services if something occurs requiring the plaintiffs to seek medical attention. In this case, Plaintiffs *will* frequently go to FedExField in the future because they *want* to attend and enjoy Redskins football games. Thus, Plaintiffs are even more likely to have future interactions with Defendants than were the parties in *Gillespie* that had standing. Therefore, Plaintiffs have established that they have suffered an injury in fact.

### iii.   Plaintiffs Continue to Suffer Harm as a Result of Defendants' Discriminatory Conduct.

Plaintiffs have demonstrated that they suffered injuries in fact before and at the time this suit commenced. *See* Undisputed Facts, § II.  First, Defendants have not addressed Plaintiffs' claim that the current location of the ribbon boards does not create an appropriate line of sight between the visual information being displayed on the Jumbotron screen and the captioning of the aural information on the ribbon boards. Specifically, the Jumbotron screens are located at either end zone in the stadium while the ribbon boards are located on either side of the stadium at the 50-yard-line.  *See* Argument, § I B i.  Thus, for instance, when the Jumbotron screens are depicting a "replay" of what has recently transpired in the course of play, Plaintiffs are unable simultaneously to view the "replay" and read what is being announced about the replay. As a result, Plaintiffs miss what is being said or displayed because it is physically impossible to see or attend simultaneously to captions on the 50-yard-line and corresponding video in the end zones.  Second, Defendants have failed to caption all of the entertainment at FedExField.  *See* Argument § I B ii.  In particular, Defendants caption almost none of the lyrics to music that plays at the stadium.  Third, Defendants do not provide any means for deaf and hard of hearing fans to enjoy the "Red Zebra" broadcasts that are played throughout the stadium's concourse areas, and are used to accompany the television screens in the concourse areas displaying the Jumbotron screen pictures.  *See* Argument § I B iii.  Thus, at the time this complaint was filed, Defendants failed to afford deaf and hard of hearing fans an equal opportunity to participate in and benefit from the services, facilities, privileges, advantages, and accommodations that

Defendants afford to hearing fans, in violation of Title III. 42 U.S.C. § 12182. These failures reinforce Plaintiffs' standing to bring this suit.

> **iv.   Plaintiffs Filed Claims Capable of Redress By This Court and Therefore They Have Standing.**

Defendants' contention that Plaintiffs lack standing because they cannot properly be redressed by injunctive or declaratory relief similarly fails. Here, again, Defendants improperly conflate standing with mootness. For instance, Defendants cite *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83 (1998), for the proposition that the plaintiffs lack standing because the defendants took some remedial steps subsequent to the filing of suit. However, the plaintiff in *Steel Co.* lacked standing because it brought suit based on an alleged injury that was redressed *prior* to the filing of suit. *Id.* at 109. In *Steel Co.*, an association of individuals interested in environmental protection sued a manufacturing company for failing to comply with a federal statute's reporting requirements for users of specified toxic and hazardous chemicals. *Id.* at 86. The association filed suit *after* the company came into compliance with the statute; thus, the Court found that the plaintiffs lacked standing because there was no possibility of redress at the time the association filed suit. *Id.* at 88. The *Steel Co.* Court distinguished between cases where the defendant takes remedial action *prior* to the filing of suit and cases where the defendant voluntarily ceases allegedly wrongful activity *after* the lawsuit is filed.[14] *Id.* at 109. The *Friends of the Earth* Court affirmed that standing is the interest that exists when a suit is initiated, and mootness relates to the continued existence of an interest throughout the course of litigation. 528 U.S. at 189.

---

[14] The *Steel Co.* Court made this distinction to differentiate between the two discussions and not to suggest that a defendant's voluntary cessation of illegal conduct moots a case. 523 U.S. at 109. In fact, a defendant's voluntary cessation of illegal conduct does not moot a case. *Id.*

Because, in this case, Defendants had taken no remedial action whatsoever at the time Plaintiffs filed this suit, the Court is fully able to redress Plaintiffs' injuries.  Even Defendants do not dispute that they took some remedial action only after Plaintiffs filed suit.  Def. Ex. 1, Decl. of Michael Dillow.

Defendants argue that Plaintiffs' harms cannot be redressed by declaratory relief because Defendants do provide *some* captioning at football events taking place at FedExField.  Like Defendants' other arguments, this contention similarly confuses the distinction between standing and mootness.  Furthermore, Defendants have repeatedly asserted that they do not believe that their previous conduct violated the ADA, making clear that they do not feel any legal compulsion to continue the limited service that they currently do provide.  Defendants Memo at 7-8 (asserting that its "failure to provide captioning at Redskins home games prior to October 2006 . . . did not [violate the ADA]," and claiming that there is no precedent requiring a professional football stadium to accommodate deaf and hard of hearing patrons).  Defendants' refusal to acknowledge their obligations under Title III further reinforces the availability of injunctive and declaratory relief to redress Plaintiffs' ongoing harms.

### C. PLAINTIFFS' CLAIMS ARE NOT MOOT BECAUSE DEFENDANTS HAVE NOT MET THE FORMIDABLE BURDEN OF DEMONSTRATING THAT THEY WILL NOT CONTINUE THEIR DISCRIMINATORY PRACTICES.

Plaintiffs' case is not moot because Defendants have not addressed all of Plaintiffs' claims and still are not in compliance with the ADA.  *See* Argument § I B. The limited steps that Defendants have taken do not moot the case.  Even if that were not true, a defendant's "voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i.e., does not make the case moot."  *U.S.*

*v. W.T. Grant Co.*, 345 U.S. 629, 632 (1953).  If it did, courts would essentially grant

such defendants leave to return to their illegal and discriminatory ways.  *See e.g.*, *Friends*

*of the Earth*, 528 U.S. at 189.  The United States Supreme Court has emphasized that a

defendant bears the "heavy" and "formidable burden" of establishing that voluntary

cessation moots a case.  *Id.*  A defendant *might* establish that a case is moot "if

subsequent events made it *absolutely clear* that the allegedly wrongful behavior could not

reasonably be expected to recur."  *Id.* (quoting *Concentrated Phosphate Export Ass'n*,

393 U.S. at 203) (emphasis added).  Defendants have not met this extremely heavy

burden.

Moreover, this case falls squarely within the recent decision of *Sheely v. MRI*

*Radiology Network, Inc.*, which held that a case was not moot even though the defendant

had voluntarily ceased the allegedly illegal conduct while the litigation was pending.  505

F.3d at 1188-89.  In *Sheely*, a plaintiff filed for declaratory and injunctive relief under

Title III of the ADA after she was denied the opportunity to accompany her minor child

during an MRI scan because she was blind and had a service dog.  *Id.* at 1178.  Several

months after the litigation commenced, the defendant implemented a policy to ensure that

individuals with service dogs are not prevented from having full access to its entire

facility in the future.  *Id.* at 1181.  After implementing the new policy, the defendant

moved for summary judgment claiming that a court could no longer redress the plaintiff's

harm and that the case was therefore moot.[15]  *Id.*  The Southern District of Florida

granted the defendant's motion.  *Id.* at 1182.  The Eleventh Circuit reversed and

---

[15] Although the defendants moved for summary judgment, the *Sheely* Court explained
that Fed. R. Civ. P. 12(b)(1) was the appropriate governing standard in an action where
the defendants claim that the court lacks subject matter jurisdiction.  505 F.3d at 1182.

remanded, holding that the defendant's voluntary cessation of illegal conduct did not moot the case. *Id.* at 1206. The Eleventh Circuit further stated that a defendant seeking to moot a case on such a basis bears the "stringent" burden of making it "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Id.* at 1184 (quoting *Friends of the Earth*, 528 U.S. at 189).

In assessing whether the defendant had made it absolutely clear that its illegal conduct would not recur, the *Sheely* Court considered three factors. *Id.* First, the Court considered whether the challenged conduct was an isolated, inadvertent incident as opposed to a deliberate, continuing practice. *Id.* at 1184-85. Second, the Court stated that it is more likely to find that voluntary cessation moots a case when the voluntary cessation is "motivated by a defendant's genuine change of heart rather than his desire to avoid liability." *Id.* at 1186. Lastly, the *Sheely* Court stated that "a defendant's failure to acknowledge wrongdoing similarly suggests that cessation is motivated merely by a desire to avoid liability, and furthermore ensures that a live dispute between the parties remains." *Id.* at 1187. Applying these factors to the facts of the case, the *Sheely* Court determined that the defendant's conduct was deliberate because it had occurred repeatedly. *Id.* at 1185. Additionally, the Court found that the defendant's new policy was motivated by a desire to avoid liability. *Id.* at 1186. Finally, because the defendant in *Sheely* repeatedly insisted that its challenged conduct was permissible, the Court found that there was a failure to acknowledge wrongdoing. *Id.* at 1187. For these reasons, the Eleventh Circuit held that the plaintiff's case was not moot. *Id.* at 1189.

Like the defendants in *Sheely*, Defendants have not made it absolutely clear that their illegal conduct will not recur. First, Defendants' failure to provide a captioning

33

system at FedExField was longstanding.  The Redskins began playing their home games at that facility in 1997 and did not begin to provide any captioning at all until midway through the 2006 season.  Ex. 14, Defendants' Answers to Singleton Interrogatories. Moreover, Mr. Feldman and the NAD corresponded with Defendants regarding their obligation to provide captioning for more than three years, but to no avail.  Ex. 6, 7, 10, 13, 27.  Defendants' blatant violations are akin to the egregious conduct of the defendant in *Sheely* which had repeatedly discriminated against individuals in violation of the ADA. In this case, Defendants told Mr. Feldman that as of June 2005, "there are no plans for captioning the Jumbotrons."  Ex. 27.  In this fashion, Defendants demonstrated a continuing and deliberate failure to provide Plaintiffs equal access to Defendants' services, facilities, privileges, advantages, and accommodations, which strongly suggests that this case is not moot.

Second, while the defendant in *Sheely* implemented a policy to bring itself into full compliance with the ADA, Defendants here only began to address Plaintiffs' complaints in an effort to discontinue this litigation.  Defendants' motivation is evidenced by their non-compliance with the ADA prior to receiving requests from deaf and hard of hearing fans, and further, by their previously mentioned utter refusal to satisfy the NAD and Plaintiff Feldman's requests prior to the commencement of this suit.  Finally, like the defendant in *Sheely*, Defendants continue to contend that they were never in violation of the ADA.  Defendants have stated to this Court that their "failure to provide captioning at Redskins home games prior to October 2006 . . . did not [violate the ADA]" and that there is no precedent requiring them to provide captioning for deaf and hard of hearing fans.  Defendants' Memorandum at 7-8.  Although Defendants claim that they have no

34

intention of discontinuing their current practice of providing *some* captioning of the stadium public address system announcements on the ribbon boards, "[s]uch a profession does not suffice to make a case moot."[16] *Grant*, 345 U.S. at 633. Because Defendants undertook remedial action to avoid liability, have a long history of discrimination, and do not admit any wrongdoing, this action is not moot.

Defendants' conduct in this case is even more egregious than the defendant's in *Sheely*. In *Sheely*, at least, the defendants implemented a policy that purported to provide full relief. 505 F.3d at 1181. In contrast, Defendants in this case still do not comply even nominally with the ADA. Defendants still do not display captioning in the same line of sight as the Jumbotron, do not caption the song lyrics, nor caption radio broadcasts. These half-hearted steps are unconvincing and do not make absolutely clear that their wrongful conduct will not recur, much less that their wrongful conduct has ceased at all.

Defendants cite to a number of cases for the proposition that a defendant's voluntary cessation of illegal conduct does moot a case. However, unlike Defendants in this case, defendants in those cases (one of which was recently vacated) were able to demonstrate that their illegal conduct would not recur. In most instances, such a showing resulted from the defendants making structural changes to their facilities that would be difficult and costly to undo. *Sharp v. Rosa Mexicano, D.C., LLC*, 496 F. Supp. 2d 93, 99 (D.D.C. 2007) (holding that a plaintiff's claim that a restaurant bathroom was not ADA compliant became moot when the restaurant made structural renovations); *Access 4 All, Inc. v. Cases Marina Owner, LLC.*, 458 F. Supp. 2d 1359, 1365 (S.D. Fla. 2006) (holding

---

[16] If an ADA case were to become moot as soon as a defendant professed that it would no longer engage in its discriminatory practices, this issue would become capable of repetition yet evading review. *See, e.g.*, *Fed. Election Comm'n v. Wisconsin Right to Life, Inc.*, 127 S. Ct. 2652, 2662 (2007).

that the plaintiff's claims were moot because the defendant's facilities had recently been

purchased by a new owner who was in the process of conducting massive renovations

that would effectively remove all architectural barriers at the facility), *vacated*, 2008 WL

311037 (11th Cir. 2008); *Brother v. CPL Investments, Inc.*, 317 F. Supp. 2d 1358, 1367-

68, 1372-73 (S.D. Fla. 2004) (holding that claims brought against a hotel for failing to

maintain a wheelchair accessible facility were moot because the defendant had remedied

the alleged structural violations); *Independent Living Res. v. Oregon Arena Corp.*, 982 F.

Supp. 698, 774-76, 786 (D. Or. 1997) (holding that some claims against a sports arena

were moot after the defendant remedied some structural violations to the plaintiff's

satisfaction); *Martinez v. Longs Drug Stores, Inc.*, No. CIVS-03-1843DFL CMK, 2005

WL 2072013, at *5 (E.D. Cal. Aug. 25, 2005) (holding that the plaintiff's claims had

become moot after the defendant remedied the alleged structural violations).[17]  In

contrast, Defendants here need only flip a switch to revert to the use of the ribbon boards

to display the scores of other NFL games as they previously did before they began to

provide captions. Ex. 33. Thus, unlike the defendants in the cases just cited, Defendants

can, at the flip of a switch, instantly return to their illegal and discriminatory ways.  Also

unlike the defendants in those cases who would have had to undo structural renovations

to return to their discriminatory ways, it would cost Defendants nothing to stop providing

captioning.  In fact, Defendants would save money because then they would no longer

---

[17] Defendants also cite *Baltimore Neighborhoods, Inc. v. LOB, Inc.* in support of their
position.  However, this case stands for the proposition that a demonstration that a
defendant will not revert to its discriminatory practices is sufficient when the facility in
question is no longer operating and there is no purpose for which the facility might re-
open. 92 F. Supp. 2d 456, 462 (D. Md. 2000) (Black, J.) (determining that a case
claiming a developer did not provide wheelchair accessible model homes was moot after
nearly all of the developer's available lots were sold and the model home had been
closed).  In contrast, Defendants make no claim that their facility is no longer operating.

need the services of a stenocaptioner to provide captioning. Defendants have done nothing more than simply state that they will not return to their former practices, which does not sufficiently establish that their discriminatory actions will not recur. *Grant*, 345 U.S. at 633. Further, as discussed, Defendants do not even purport to provide the complete relief that Plaintiffs seek.

For these reasons, Defendants have not met their stringent burden of establishing that their discriminatory conduct will not recur, and this Court should find that this case is not moot.

## THIS COURT SHOULD GRANT INJUNCTIVE AND DECLARATORY RELIEF

Based on the foregoing, Plaintiffs are entitled to a declaration that Defendants are obligated to caption all aural information presented at FedExField as part of Washington Redskins home games, including but not limited to: a) emergency and evacuation information; b) game information provided over the public address system; c) the audio component of any video displayed on the Jumbotron screens with appropriate line of sight to view the video and captions simultaneously; d) the lyrics of any songs played either in the stadium bowl or the concourse areas; and e) any radio broadcast that is played in the stadium or concourse areas. Because Defendants have to date refused to provide c, d and e above, Plaintiffs are also entitled to an injunction requiring that such captioning be provided beginning with the next home football game played at FedExField.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment should be denied and Plaintiffs' Cross-Motion for Summary Judgment should be granted.

Respectfully Submitted,

_____/s/_____
Joseph B. Espo
Federal Bar No. 07490
jbe@browngold.com
Brown, Goldstein & Levy, LLP
120 East Baltimore Street
Suite 1700
Baltimore, Maryland  21202
Phone:  (410) 962-1030

_____/s/_____
Marc P. Charmatz
Federal Bar No. 09358
marc.charmatz@nad.org
and
Rosaline Crawford
Federal Bar No. 15643
rosaline.crawford@nad.org
National Association of the Deaf
Law and Advocacy Center
8630 Fenton Street, Suite 820
Silver Spring, Maryland 20910
(301) 587-7732 (V/TTY)

_____/s/_____
Rebecca B. Baden
Student Attorney*
Rebecca.baden@clinic.law.umaryland.edu
University of Maryland School of Law
500 W. Baltimore Street
Baltimore, Maryland 21201

Attorneys for Plaintiffs

_____

* Practicing pursuant to Rule 702 of the Local Rules of the United States District Court
for the District of Maryland, and Maryland Rule 16 governing admission to the bar.